******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# IN RE LOYAL H. ET AL.[*]
# (AC 48934)

Cradle, C. J., and Moll and Palmer, Js.

*Syllabus*

The respondent father appealed from the trial court's judgments adjudicating his four minor children neglected. The father claimed that the evidence was insufficient to support the court's findings of neglect. *Held*:

The trial court did not improperly deny the respondent father's motions to strike the neglect petitions filed by the petitioner, the Commissioner of Children and Families, as to two of his children, as his claim that those petitions did not allege any abuse was belied by the amended neglect petitions the petitioner had filed, which alleged that those two children were being permitted to live under circumstances that were injurious to their well-being, and, even if those two children had not been abused themselves, the allegations of physical abuse and violence on the part of the father and the paternal grandmother as to the other two children were sufficient to find that all of the children were living under circumstances that were injurious to their well-being.

The respondent father's challenge to the trial court's determination that the children were neglected was unavailing, as the evidence showed that three of the children had scars that were indicative of abuse, and the court credited one of the children's statements to the police that she had been abused and gave weight to the paternal grandmother's concession that "kids should be beaten; that's the way we do it."

Moreover, even if the respondent father's assertions that he had engaged in and benefited from services were true, along with his claims that one of the children bore no bruises and that all of the children were visible in the community, that did not negate the court's findings of physical abuse.

Argued January 14—officially released March 16, 2026[**]

*Procedural History*

Petitions by the Commissioner of Children and Families to adjudicate the respondent father's four minor children neglected, brought to the Superior Court in the judicial

---

[*]In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

[**]March 16, 2026, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

district of Waterbury, Juvenile Matters, where the court, *Nadim, J.*, granted in part the petitioner's motion to consolidate the cases; thereafter, the court denied the respondent's motions to strike the petitions as to two of the minor children and granted the petitioner's motions to amend the petitions; subsequently, the cases were tried to the court; judgments adjudicating the minor children neglected and committing them to the custody of the petitioner, from which the respondent appealed to this court. *Affirmed*.

*David E. Schneider, Jr.*, assigned counsel, for the appellant (respondent father).

*Nisa J. Khan*, assistant attorney general, with whom were *Matthew J. Parenti*, assistant attorney general, and, on the brief, *William Tong*, attorney general, for the appellee (petitioner).

*Opinion*

CRADLE, C. J. The respondent father appeals from the judgments of the trial court adjudicating his four minor children, J, S, A and L, neglected.[1] On appeal, the respondent claims that (1) the court erred by denying his motions to strike the neglect petitions as to S and L, and (2) there was insufficient evidence to support the court's findings of neglect as to his four children.[2] We affirm the judgments of the trial court.

On January 4, 2025, the Department of Children and Families (department) invoked a ninety-six hour hold as

---

[1] The mother of L is deceased. The mother of J and S—O—appeared in the trial court, did not respond to the neglect petitions and did not file an appeal. The mother of A did not appear in the trial court. We therefore refer in this opinion to the respondent father as the respondent.

[2] The respondent initially also challenged on appeal the trial court's orders granting temporary custody of his four children to the petitioner. Since the date of the filing of this appeal, the court has, by way of the dispositional phase of the proceedings following the adjudications of neglect, committed A and L to the custody of the petitioner and J and S to the custody of their mother. This court therefore granted the petitioner's postjudgment motions to dismiss as moot the respondent's challenges to the orders of temporary custody. See, e.g., *In re Forrest*

to the respondent's four children. See General Statutes § 17a-101g. On January 7, 2025, the petitioner, the Commissioner of Children and Families, filed motions for ex parte orders of temporary custody as to each of the children, alleging that they were in immediate physical danger. The ex parte orders were issued on that same day, and hearings on them were scheduled for January 15, 2025.

Also on January 7, 2025, the petitioner filed neglect petitions as to each of the four children, alleging that the children had physical injury or injuries inflicted by other than accidental means. The neglect petitions were scheduled for hearings on February 18, 2025.[3]

On January 22, 2025, the respondent filed motions to strike, inter alia, the neglect petitions as to S and L on the grounds that the underlying allegations did not concern them.

On January 23, 2025, the petitioner moved to amend the neglect petitions to add the ground that the four children were being denied proper care and attention and were being permitted to live under conditions that were injurious to their well-being as alleged in the department's summary of facts dated January 8, 2025. The petitioner objected to the motions to strike the neglect petitions on the ground, inter alia, that they were moot due to the amendment to the neglect petitions.

On January 24, 2025, the first day of the neglect trial, the court granted the petitioner's motions to amend the neglect petitions. The court also denied the respondent's motions to strike. The court reasoned that, "[i]n light of the [petitioner's] amendments to the neglect petition[s]

*B.*, 109 Conn. App. 772, 776, 953 A.2d 887 (2008) ("[o]ur case law specifically conceives of appeals from temporary custody as moot when the children involved are adjudicated neglected").

[3] The petitioner moved to consolidate the temporary custody orders and neglect petitions as to each child for a single hearing. Over the respondent's objection, the trial court granted the motion as to the hearings on the temporary custody orders and the adjudicatory phase of the neglect proceedings. The consolidation is not at issue on appeal.

and the withdrawal of the abuse allegations, the court rules as follows: The purpose of a motion to strike is to challenge the legal sufficiency of the allegations of a complaint for a failure to state a claim on which relief can be granted. The [petitioner's] pleadings must be read in the most broad manner, and the court is to look at the allegations in the light most favorable to the moving party. Subsequently, because the [petitioner's] pleadings are inarticulate does not mean they are insufficient and unable to survive a motion to strike. The allegations here are that there is a presence of violence in the home. This is a basis, if proven, to establish a finding of neglect. Therefore, [the respondent's] motion[s] to strike the neglect petition[s] [are] denied."

The court then proceeded with the trial, which spanned several days. On June 4, 2025, the court orally issued its decision, adjudicating the respondent's four children neglected. The court stated: "[J] is twelve years old, [S] is nine years old, [A] is seven years old, and [L] is one and a half years old.

"On January 3, 2025, the mother of [J] and [S]—[O], who resides in California—made a report to [the department] of suspected abuse by the respondent . . . and the paternal grandmother . . . .

"[O] reported that she had been with the children at Thanksgiving in Ohio along with a paternal aunt, and that the children had shared being physically abused by the respondent . . . .

"As a result of the report, Waterbury Police [Officer Flori Martinaj] responded to the respondent's . . . home on January 3, 2025. At the time when the police first responded to the home, none of the children nor the respondent . . . or the paternal grandmother reported any physical abuse. The children did not disclose any information to the police, as the respondent father was present the entire time.

"After the police left, [J] spoke with her paternal aunt via phone, who told her that she could remain in the

home until a future court date hearing in family court between . . . [O and] . . . the respondent . . . or leave the home with her siblings. That same night, [J] left with [A], unbeknownst to the respondent . . . and went to the [store] around the corner. . . . There, [J] called the paternal aunt, who, in turn, called the Waterbury Police Department. . . .

"Martinaj responded to the [store] where he met with [J] and [A]. [J] apologized to the officer for not telling him previously about the abuse because [the respondent] was watching the entire time. . . . She stated that, if [the respondent] wasn't there, she would have told him that she gets beaten frequently, along with her siblings, in the form of being hit with hands, belts, shoes, or metal pipes. A said the same thing. . . .

"Martinaj observed dark scars and bruising to the lower back and legs of both [A] and [J]. He called an ambulance, which brought the children to St. Mary's Hospital [in Waterbury]. . . . [Martinaj] then returned to the respondent's . . . home where [the respondent] was arrested for three counts of assault in the third degree and three counts of risk of injury to a child. . . .

"[U]pon transport to the hospital, [emergency medical services personnel] noted bruising on both [of A's] arms with scratches, which [A] reported were done by the respondent . . . . [A] reported to the emergency room at [the hospital] that she was hit that night with a metal pole by the respondent . . . . She reported that she has been beaten with a belt in the past. She stated that both the respondent . . . and the paternal grandmother hit her and her siblings. Her skin was noted to be positive for a wound and indicated on the hospital records to see photos. The photos presented to the court displayed that she had a large bruise above her knee as well as two smaller bruises to her buttocks and two fresh cuts on her forearms. A full [examination] was conducted, in which there was noted to be bruising to the left knee and left lower anterior leg. She also had healing linear abrasions to her forearms, which she reported were due

to being struck with a belt. The hospital records indicate diagnosis, in quotations, 'child abuse initial encounter,' end quote.

"[S] was also evaluated at St. Mary's Hospital on January 3, 2025. During his physical [examination], it was noted for a healing linear mark to his lower back. The hospital records reflect diagnosis, in quotes, 'suspected physical abuse of child initial encounter' . . . .

"On January 3, 2025, [the department] received a call from [advanced practice registered nurse] Meecha Calle from St. Mary's Hospital to the [the department's] Careline to report that the children were reporting being abused by the respondent . . . . She reported that [J] had bruising and scratches, and that [J] reported being hit by the respondent . . . with a belt and pipe.

"Social worker Tameka Plunkett spoke with the children once they came into care. She spoke with [J], who shared that the reason she came into care is that she is being beaten by [the respondent]. She stated that he would hit her with a belt, shoe, hanger, or part of a pipe when she doesn't do chores or takes too long to do dishes; that it's common; and that it happens when she doesn't do what she's told by the respondent . . . or the paternal grandmother. She reported that the last time she was hit was by [the respondent] on January 3, 2025. She said that the paternal grandmother does not intervene and also beats her with a hanger or punches her in the face when she gets angry. . . .

"Plunkett spoke with [A], who stated that she has witnessed [the respondent] beat [J] and has asked him to stop but he continues. She said she witnessed him beating her with a belt. She did not say how often it happens but that it does happen if she takes too long to do chores or dishes. She also report[ed] being slapped on the hand by the respondent . . . .

"Plunkett also spoke with [S] . . . . She stated that he presented as nervous, fearful, and hesitant to share his feelings.

"[Plunkett] spoke with the paternal grandmother regarding the allegations during a considered removal meeting on January 7, 2025, where the paternal grandmother admitted to the use of physical discipline. She stated that . . .'[k]ids should be beaten; that's the way we do it' . . . and acknowledged using a slipper and belt.

"The respondent . . . testified that under no circumstances does he use physical discipline and that he has conveyed this to the paternal grandmother. He stated he is aware of the paternal grandmother's statement that 'kids should be beaten; that's the way we do it,' but that it was taken out of context. He testified that his mother has never physically disciplined the children, nor has he. When shown hospital photos of [A] and [S], which displayed bruising and cuts, he stated [that] he did not see any injuries in the photos and acknowledged only superficial scratches.

"The court credits the initial disclosures made by [J] and [A] regarding physical abuse inflicted by the respondent . . . and the paternal grandmother. The court recognizes that . . . at a subsequent date, [A] denied witnessing physical abuse; however, no plausible alternative explanation has been given as to how she received a large bruise on her leg or small bruises to her buttocks.

"The paternal grandmother, on her own volition, conceded that she physically disciplines the children, and has previously stated that 'kids should be beaten' and admitted to using a slipper and belt. These statements were made at the considered removal meeting. . . . The [respondent's] testimony directly contradicts the paternal grandmother's own admissions, and the court can find no reasonable explanation why the paternal grandmother would have made those concessions at the considered removal meeting other than that they are true.

"The court does not find the [respondent's] testimony to be credible. When presented with the hospital photos of [A] and [S], he stated [that] he did not see any bruising or cuts and only acknowledged what he called superficial

scratches. This testimony by [the respondent] reduces his credibility for his lack of candor to the court and is indicative of his refusal to acknowledge injuries sustained by his children.

"The respondent . . . has a troubling [department] history, both in Connecticut and Michigan, relating to concerns of [intimate partner violence], anger issues, and questionable parental judgment.

"To date, no viable alternative explanation has been given to explain the injuries sustained by [A], [S] and [J], other than the reports by [A] and [J] that they were inflicted by the respondent . . . and the paternal grandmother.

"Based on the factual findings set forth, the court finds by a fair preponderance of the evidence presented at trial that the children would be in immediate physical danger from their surroundings if they were returned home, that removal from the home is necessary to ensure their safety, and return to their home at this time is contrary to their welfare. The court further finds that reasonable efforts to prevent or eliminate the need for removal of the children were made by the [department]. The orders of temporary custody are sustained and custody is vested [in the petitioner].

"The court also finds by a fair preponderance of the evidence presented at trial that, as of the date of the filing of the last amendment to the neglect petitions, the children were neglected and that they were permitted to live under conditions injurious to their well-being. Accordingly, the court enters an adjudication of neglect as to all four children." This appeal followed.

The following legal principles are relevant to the respondent's claims on appeal. "Neglect proceedings, under . . . [General Statutes] § 46b-129, are comprised of two parts, adjudication and disposition. . . . The standard of proof applicable to nonpermanent custody proceedings, such as neglect proceedings, is a fair preponderance of the evidence. . . .

"During the adjudicatory phase, the court determines if the child was neglected. Practice Book § 35a-7 (a) provides in relevant part: In the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment . . . . [General Statutes § 46b-120 (4)] provides that a child may be found neglected if the child is being denied proper care and attention, physically, educationally, emotionally or morally, or is being permitted to live under conditions, circumstances, or associations injurious to the well-being of the child or youth . . . ." (Internal quotation marks omitted.) *In re P. M.*, 226 Conn. App. 378, 389–90, 318 A.3d 1085, cert. denied, 349 Conn. 919, 320 A.3d 978 (2024). This court has held that a respondent parent fails to provide for the emotional well-being of a child by abusing another child in his or her presence. See, e.g., *In re Nelmarie O.*, 97 Conn. App. 624, 629, 905 A.2d 706 (2006); see also *In re Payton V.*, 158 Conn. App. 154, 162, 118 A.3d 166 (abusing sibling in child's presence or earshot constitutes act of parental commission that fails to provide for child's emotional well-being), cert. denied, 317 Conn. 924, 118 A.3d 549 (2015).[4] With these principles in mind, we address the respondent's claims in turn.

I

The respondent first claims that the trial court erred by denying his motions to strike the neglect petitions as to S and L. We disagree.

Practice Book § 34a-15 (a) provides in relevant part that, "[w]henever any party wishes to contest . . . the legal sufficiency of the allegations of any petition, or of any one or more counts thereof, to state a claim upon which relief can be granted . . . that party may do so by filing a motion to strike the contested petition or part thereof." It is well settled that "[b]ecause a motion to

[4] Although *In re Nelmarie O.* and *In re Payton V.* involved petitions to terminate the respective respondents' parental rights, the impact of a child's exposure to the physical abuse of his or her siblings would similarly impact a child's well-being in a neglect proceeding.

strike challenges the legal sufficiency of a pleading and, consequently, requires no factual findings by the trial court, our review of the court's ruling on the [motion to strike] is plenary. . . . We take the facts to be those alleged in the [petition] . . . and we construe the [petition] in the manner most favorable to sustaining its legal sufficiency. . . . *Thus, [i]f facts provable in the [petition] would support a cause of action, the motion to strike must be denied.* . . . Moreover, we note that [w]hat is necessarily implied [in an allegation] need not be expressly alleged. . . . It is fundamental that in determining the sufficiency of a [petition] challenged by a [respondent's] motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted. . . . Indeed, pleadings must be construed broadly and realistically, rather than narrowly and technically." (Emphasis in original; internal quotation marks omitted.) *Spiotti* v. *Clarke*, 235 Conn. App. 715, 721, 346 A.3d 562 (2025).

The respondent contends that the trial court erred in denying his motions to strike the neglect petitions as to S and L because those petitions did not allege any abuse as to those two children. As noted herein, however, the petitioner filed amended neglect petitions alleging that the children were being permitted to live under circumstances that were injurious to their well-being. As the court aptly noted, even if S and L were not abused themselves, the allegations of physical abuse and violence on the part of the respondent and the paternal grandmother as to the other children were legally sufficient to find that all of the children were living under circumstances that were injurious to their well-being. We therefore reject the respondent's claim that the court improperly denied his motions to strike the neglect petitions as to S and L.

II

The respondent also claims that the trial court erred when it adjudicated the children neglected on the ground that they were being permitted to live under conditions that were injurious to their well-being. We disagree.

"When considering a challenge to the sufficiency of the evidence, the function of an appellate court is to review the findings of the trial court, not to retry the case. . . . [W]e must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . We also must determine whether those facts correctly found are, as a matter of law, sufficient to support the judgment. . . . [W]e give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses . . . ." (Internal quotation marks omitted.) *In re P. M.*, supra, 226 Conn. App. 390.

In challenging the trial court's neglect adjudication, the respondent argues that the department noted that L was nourished and healthy and bore no marks or bruises. He also argues that S did not report that he or any of the siblings had been abused or neglected and that A had recanted her statement to the police that she had been abused or neglected by the respondent. In so arguing, the respondent ignores the court's findings that J, S and A had presented with scars indicative of abuse, that the court credited A's initial statement to the police that she had been abused and that the respondent's testimony that neither he nor the children's paternal grandmother had physically abused the children was not credible. In addition to the evidence of physical abuse, the court gave weight to the paternal grandmother's concession that "kids should be beaten; that's the way we do it," and that she had done so using a slipper or a belt. Moreover, notably absent from the respondent's argument is any mention of the abuse of J or an assertion that either he or the paternal grandmother hid the abuse from the other children. As noted herein, the abuse of one of the children, in the presence of the others, in itself, would support a determination that all four children were living under conditions that were injurious to their well-being.

The respondent also argues that the neglect adjudications were erroneous because he had "engaged in services

and had benefited from those services." He also contends that there was no evidence that the children lived in inadequate housing and the children were visible in the community in that they attended school and were involved in their church. Even if the respondent's assertions were true, they do not negate the trial court's findings of physical abuse, which were supported by the evidence. Accordingly, the respondent's challenges to the neglect adjudications fail.

The judgments are affirmed.

In this opinion the other judges concurred.